*In re* CULLMANN ESTATE

CULLMANN v JEDD

Docket No. 99512. Submitted April 6, 1988, at Detroit. Decided July 6, 1988.

Theodore Cullmann, as personal representative of the estate of Julianna Cullmann, deceased, petitioned the Wayne County Probate Court to direct Margaret Jedd to turn over to the decedent's estate the proceeds from certain bank accounts previously held jointly by Jedd and the decedent. The probate court, Thomas A. Maher, J., granted the petition. Respondent Jedd appealed.

The Court of Appeals *held:*

1. The probate court correctly determined that the decedent, during her lifetime, intended to retain control over the bank accounts she alone funded but held jointly with the respondent. The decedent did not intend, upon opening the joint accounts at issue, to make a gift of the accounts to the respondent. Moreover, a trust and confidence existed between the decedent and the respondent such that the latter was not to use the funds in the jointly held accounts for personal purposes during the life of the decedent.

2. However, MCL 487.703; MSA 23.303 provides that a deposit made in a jointly held bank account with the right of survivorship, in the absence of fraud and undue influence, is prima facie evidence of the depositor's intention to vest title to the deposit in a surviving joint owner. This presumption can, however, be rebutted by reasonably clear and persuasive proof to the contrary, i.e., by proof of the decedent's intent that title to the jointly held funds not vest in the survivor. In this case, when the evidence offered to show that the decedent had not intended the respondent to acquire title to the accounts by virtue of survivorship is disregarded, as the probate court should have done since the evidence was not admissible under the hearsay exception for a statement on then existing mental

REFERENCES

Am Jur 2d, Banks §§ 369 *et seq.*

Creation of joint savings account or savings certificate as gift to survivor. 43 ALR3d 971.

condition and it violated the common-law rule that statements made by a decedent regarding the decedent's state of mind when creating a joint account are not admissible if made after the joint account is created, other competent evidence indicates that the decedent had intended the respondent to acquire title to the joint accounts after the decedent's death. Thus, had the respondent not withdrawn the funds from the joint accounts one month before the decedent's death, the respondent would have acquired title to the accounts upon surviving the decedent. Since there is nothing in the record that suggests fraud, coercion or impropriety by the respondent when she withdrew the funds from the accounts, it would be inequitable to require the respondent to turn the funds over to the decedent's estate.

Reversed.

1. BANKS AND BANKING — JOINT ACCOUNTS — RIGHT OF SURVIVOR-SHIP.

A deposit made in a jointly held bank account with the right of survivorship becomes the property of the joint tenants and may be paid to any one of such individuals during his lifetime or to the survivor or survivors of such individuals; a deposit made in a jointly held bank account with the right of survivorship shall, in the absence of fraud or undue influence, be prima facie evidence of the depositor's intention to vest title to the deposit in a surviving joint owner (MCL 487.703; MSA 23.303).

2. BANKS AND BANKING — JOINT ACCOUNTS — INTENT — EVIDENCE.

Statements made by a decedent regarding the decedent's state of mind when depositing money into a joint bank account are not admissible into evidence if the statements were made after the joint bank account deposit was made.

*D'Agostini, McKinnon, Sable & Ruggeri, P.C.* (by *Donald M. Strehl*), for petitioner.

*Kiefer, Allen, Cavanagh & Toohey* (by *H. Rollin Allen*), for respondent.

Before: J. H. GILLIS, P.J., and WAHLS and DOCTOROFF, JJ.

PER CURIAM. Respondent, Margaret Jedd, appeals as of right from a March 10, 1987, order of the Wayne County Probate Court directing her to

turn over to the estate of Julianna Cullmann the proceeds of certain bank accounts previously held jointly by Jedd and Cullmann. We reverse.

The record reveals that Jedd and Cullmann were neighbors and close friends since 1948. Jedd stated that Cullmann was treated like a member of her family and that she thought of Cullmann as being "like a mother" to her. The two women were often together, and Cullmann spent holidays with Jedd and her family. For several years, Cullmann baby-sat for Jedd's daughter. Jedd sometimes ran errands for Cullmann, and when the latter was sick Jedd would take her to the hospital.

In 1981, Cullmann funded two joint bank accounts with Jedd.[1] The signature cards for the accounts were signed by both Cullmann and Jedd, one specifying that the funds in the account were the property of the signatories as joint tenants and would be paid to "any one of the undersigned or to any survivor of them," and the other stating that the funds were "payable to either with right of survivorship." Jedd testified that when these accounts were established Cullmann told her that the accounts—one a savings account and the other a money market account—were for Jedd. Jedd also testified that Cullmann owned an individual savings account containing $4,000 and kept $1,000 in cash hidden in her home in a place known to Jedd, apparently accumulated from social security payments and wages earned from baby-sitting and ironing, in order to pay her living expenses.

In May, 1985, Cullmann suffered a heart attack and was hospitalized. While in the hospital she told Jedd to take possession of the bank account

---

[1] Theodore Cullmann, the personal representative of the estate of Julianna Cullmann, in his "petition on objections to appeal bond," dated April 1, 1987, and filed in the probate court, stated that the amount in controversy in this case is "approximately $14,000.00."

books. At the end of May, when Cullmann returned home, Jedd returned the books to Cullmann, who said that if she were to become ill in the future Jedd should again take custody of the books. Shortly thereafter, when Cullmann returned to the hospital, Jedd again took custody of the bank account books. On June 12, 1985, Jedd withdrew the money from, and closed, the joint bank accounts, almost one month prior to Cullmann's death on July 10, 1985.

Ann Wrubel, Cullmann's niece, testified that when her aunt was in the hospital in 1985 she said that Jedd had access to her bank account and was "taking care of all her business." Henry Gutenkunst, whose wife was related to Cullmann, testified that three years before her death Cullmann said that she had a $10,000 money savings certificate in a joint account with Jedd which was to be cashed at the time of her death in order to pay her debts and funeral expenses, with the remainder returning to her estate.

On May 7, 1986, petitioner, Theodore Cullmann, the personal representative of Cullmann's estate, filed a petition requesting the probate court to declare the proceeds of the joint bank accounts to be assets of Cullmann's estate. He alleged that Jedd exerted undue influence in order to convince Cullmann to open the joint accounts and that Cullmann established the accounts merely for her convenience and without the intention of Jedd's obtaining survivorship rights. After hearing testimony, the probate court issued a written opinion on December 18, 1986, and an order on March 10, 1987, directing Jedd to turn over to Cullmann's estate the proceeds of the joint bank accounts. On appeal, Jedd argues, among other things, that the probate court erred in ordering her to turn over

the proceeds of the accounts to Cullmann's estate. We agree.

The probate court, in concluding that the funds withdrawn by Jedd were being held by her under a constructive trust and had to be turned over to Cullmann's estate, reasoned—citing solely *Allstaedt v Ochs,* 302 Mich 232; 4 NW2d 530 (1942)— that since the funds had been withdrawn during Cullmann's lifetime, Jedd's ability to receive them as a joint owner by way of a right of survivorship was not in issue: "Mrs. Jedd," the court observed, "did not wait to be a survivor. She withdrew the funds before Mrs. Cullmann [sic] death." Thus, the probate court declined to assess Jedd's entitlement to the bank accounts as a surviving joint owner, framing the issue as "whether or not Mrs. Cullmann intended [to make] a present gift of the joint bank accounts at the time they were established." Having determined "the fact that Mrs. Cullmann retained the [bank account books] in her possession and that she gave them to Mrs. Jedd for safekeeping but then required them from Mrs. Jedd upon her return from the hospital would indicate she did not intend [to make] a present gift," the probate court declared that Jedd had no right to keep Cullmann's money.

First, we note that Michigan's joint ownership statute regarding bank accounts provides that a deposit made in a jointly held bank account with the right of survivorship becomes the property of the joint tenants and may be paid to any one of such individuals during his or her lifetime or to the survivor or survivors of such individuals. MCL 487.703; MSA 23.303; see also *Wright v White,* 156 Mich App 1, 6-7; 401 NW2d 288 (1986), lv gtd 428 Mich 873 (1987). Moreover, that statute provides that a deposit made in a jointly held bank account with the right of survivorship shall, in the absence

of fraud or undue influence, be prima facie evidence of the depositor's intention to vest title to the deposit in a surviving joint owner. MCL 487.703; MSA 23.303. See *Jacques v Jacques,* 352 Mich 127, 134-138; 89 NW2d 451 (1958); *Traverse City State Bank v Marron,* 29 Mich App 518; 185 NW2d 558 (1971), remanded on other grounds 385 Mich 753; 187 NW2d 215 (1971).[2]

Having briefly noted the content of the joint

[2] The full text of the joint ownership statute provides:

*When a deposit shall be made, in any bank by any person in the name of such depositor or any other person, and in form to be paid to either or the survivor of them, such deposits* thereupon and any additions thereto, made by either of such persons, upon the making thereof, *shall become the property of such persons as joint tenants,* and the same together with all interest thereon, shall be held for the exclusive use of the persons so named *and may be paid to either during the lifetime of both,* or to the survivor after the death of 1 of them, and such payment and the receipt or acquittance of the same to whom such payment is made shall be a valid and sufficient release and discharge to said banking institution for all payments made on account of such deposits prior to the receipt by said bank of notice in writing not to pay such deposit in accordance with the terms thereof.

*When a deposit has been made,* or shall hereafter be made, in any banking institution transacting business in this state, *in the names of 2 or more persons, payable to either or the survivor or survivors, such deposit* or any part thereof or any interest or dividend thereon and any additions thereto, *made by any 1 of the said persons, shall become the property of such persons as joint tenants,* and the same shall be held for the exclusive use of the persons so named *and may be paid to any 1 of said persons during the lifetime of said persons or to the survivor or survivors after the death of 1 of them,* and such payment and the receipt or acquittance of the same to whom such payment is made shall be a valid and sufficient release and discharge to said banking institution for all payments made on account of such deposits prior to the receipt by said bank of notice in writing not to pay such deposit in accordance with the terms thereof.

*The making of the deposit in such form shall, in the absence of fraud or undue influence, be prima facie evidence, in any action or proceeding, to which either such banking institution or surviving depositor or depositors is a party, of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors.* [Emphasis added. MCL 487.703; MSA 23.303.]

tenancy statute regarding bank accounts, we now
turn to the only case cited by the probate court in
its opinion. In *Allstaedt, supra,* a father opened
two bank accounts to be held jointly by himself
and his daughter. At the time the accounts were
opened the daughter promised her father that she
would not withdraw any money from the accounts
without his consent. Two months before the father
died, however, the daughter broke her promise and
withdrew the funds from the two accounts. The
Supreme Court, noting that jointly held bank ac-
counts create by way of statute a rebuttable pre-
sumption establishing that title to such accounts is
vested in a named joint owner, stated that "the
simple question presented here . . . is whether or
not [the father] made a gift of the two bank
accounts to his daughter." 302 Mich 235. Empha-
sizing that the daughter herself had admitted that
she was not to withdraw money without her fa-
ther's consent and that a bank manager testified
that the father stated at the time he opened one of
the accounts that the joint ownership of the ac-
count "was for the purpose of having someone able
to take care of emergencies," *id.,* p 237, the Su-
preme Court concluded that the father did not
intend to make a gift to his daughter of the bank
accounts. Therefore, the Supreme Court affirmed
the lower court's decree ordering the daughter to
pay to her father's estate the money, with interest,
she had withdrawn from the jointly held accounts
prior to her father's death.

In another case with some factual similarity to
the case at bar, the Supreme Court upheld a lower
court's decree requiring a named joint owner of
certain bank accounts to turn over to the estate of
a deceased joint owner the funds withdrawn from
the joint account during the lifetime of the de-
ceased joint owner. In *Hazen v Elmendorf,* 365

Mich 624; 113 NW2d 892 (1962), the decedent established joint bank accounts in the name of herself and of the defendant, Mrs. Verely M. Elmendorf. Testimony showed that the accounts were created for the purpose of permitting Elmendorf to render assistance in the withdrawal and investment of funds for the benefit of the decedent. However, Elmendorf withdrew money from the accounts and used it for her own purposes. The Supreme Court thus affirmed the lower court's declaration that Elmendorf held the withdrawn funds in a constructive trust for the decedent's estate.

We agree with the probate court that, during her lifetime, Cullmann intended to retain control of her joint bank accounts, desiring that only after her death would title to the funds in those accounts become fully vested to Jedd. If this were not the case, why would Cullmann so scrupulously have retained possession of the account books except during those periods at the end of her life when she was hospitalized and, apparently, in great peril of death? Jedd was not told at the time Cullmann opened the accounts how much money the accounts contained, and she was not given access to the account books until several years had elapsed and Cullmann was hospitalized with life-threatening medical ailments. Prior to the onset of Cullmann's serious medical problems, for which hospitalization was required, Jedd never presumed to treat the money in the accounts as her own, or even to discuss with Cullmann whether the funds were available for her withdrawal. Accordingly, we conclude that, as in *Allstaedt,* the funding depositor in this case did not intend, upon opening the joint accounts at issue, to make a gift of the accounts to the named joint owner. Moreover, we conclude that, as in *Hazen,* a trust and confidence

existed between the funding depositor and the named joint owner such that the latter was not to use the funds in the jointly held accounts for personal purposes during the life of the funding depositor. Thus, were we to stop at this point in our analysis, we would affirm the probate court's order requiring Jedd to turn over to Cullmann's estate the funds she withdrew from the jointly held bank accounts approximately one month before Cullmann's death.

We do not affirm the probate court's order, however, because we feel that that court prematurely ended its analysis of the issue presented. Had Jedd not withdrawn the funds from the jointly held bank accounts prior to Cullmann's death, she would have been the only surviving joint owner of the accounts. Nothing in the record suggests that either Cullmann herself or anyone else acting legally in her behalf sought to withdraw the funds for any legitimate purpose. Thus, equity requires that we continue our analysis and determine whether, as a surviving joint owner of the accounts, Jedd was entitled to receive the withdrawn funds.

As already noted, Michigan's joint ownership statute regarding bank accounts provides that a deposit made in a jointly held bank account with the right of survivorship, in the absence of fraud or undue influence, is prima facie evidence of the depositor's intention to vest title to the deposit in a surviving joint owner. MCL 487.703; MSA 23.303; *Jacques, supra; Traverse City State Bank, supra.* This presumption can, however, be rebutted by reasonably clear and persuasive proof to the contrary, i.e., by proof of the decedent's intent that title to the jointly held funds not vest in the survivor. *Jacques, supra.* While mindful that this statutory presumption disappears upon the intro-

duction of contrary evidence, *Pence v Wessels,* 320 Mich 195, 199-200; 30 NW2d 834 (1948), we do not believe that the evidence introduced in this case shows that Cullmann intended that title to the funds held in the name of herself and Jedd was not to vest in Jedd upon Cullmann's death. Indeed, we believe that the competent evidence in this case establishes exactly the opposite.

Jedd testified that she and Cullmann signed the signature cards for the bank accounts in each other's presence in 1981 and that when doing so Cullmann told her that the accounts were for her. According to Jedd, Cullmann never mentioned using the money in the accounts for Cullmann's burial or other expenses. The two women shared a close and longstanding relationship, Jedd testifying that she thought of Cullmann as being "like a mother" to her. Jedd never asked Cullmann whether she could withdraw from the joint account during Cullmann's lifetime, but when Cullmann suffered a heart attack and was hospitalized in May, 1985, Cullmann gave Jedd possession of the bank account books. Shortly thereafter, when Cullmann returned home and reacquired the bank account books, she told Jedd to take the books in the future if she, Cullmann, ever became ill. In June, 1985, Cullmann suffered a stroke and Jedd took the bank account books.

The only significant evidence tending to rebut the proposition that Cullmann intended title to the jointly held funds to vest in Jedd upon Cullmann's death is that proffered by Henry Gutenkunst, who was related to Cullmann. Gutenkunst testified that approximately three years prior to her death, Cullmann told him: "All I've got is a ten thousand dollar money saving[s] certificate in the bank in joint with Mrs. Jedd, which is to be cashed upon my death to pay all debts, funeral, doctor and

what-have-you, and the rest is to go into the estate and give—divided in the will." This hearsay testimony, however, was improperly admitted into evidence over continuing objections from Jedd's attorney. Under MRE 803(3), hearsay may be admissible into evidence if it concerns the declarant's "then existing state of mind." Gutenkunst's testimony did not relate to Cullmann's state of mind or intent at the time she created the joint bank accounts. Rather, it related to her state of mind at a time long after the creation of the accounts. In addition, the Supreme Court has clarified that statements made by a decedent regarding the decedent's state of mind when depositing money into a joint bank account are not admissible into evidence if the statements were made after the joint bank account deposit was made. In *Pence, supra,* p 204, the Supreme Court stated:

> The record discloses that the testimony of the disinterested witness which appellant claims was inadmissible showed statements made by the deceased to this witness not in the presence of the defendant, both before and after the deceased had made the joint bank account deposits here in question. The trial court received this testimony for the purpose of showing the decedent's intentions and state of mind at the time the joint bank accounts were created, to rebut the statutory presumption. Said witness testified that the deceased, in discussing his bank accounts with her, made reference to his intention to leave his property to his sister Mary. To the extent that this testimony purported to disclose statements allegedly made by the deceased not in the presence of the defendant, *after* the joint bank deposits were made, and decedent's statements made at that time referring to his will and his intentions in disposing of his property thereunder, the testimony of this witness was not admissible to show his intentions with

reference to the deposits at the time they were made. On the other hand, much of the testimony adduced from this witness was admissible. It was proper to show the decedent's intentions and arrangements prior to his making the joint bank accounts, to rebut the presumption of joint ownership between the deceased and the defendant. *Mitts v Williams,* [319 Mich 417; 29 NW2d 841 (1947)]. [Emphasis in original. See also *Serkaian v Ozar,* 49 Mich App 20, 23-24; 211 NW2d 237 (1973).]

In view of the inadmissibility of Gutenkunst's testimony, there was nothing to suggest that Cullmann did not intend Jedd to acquire title to the jointly held bank accounts upon the death of Cullmann. Accordingly, we conclude that, as a joint owner of the accounts funded by Cullmann, Jedd—had she not withdrawn the funds in question prior to Cullmann's death—would have been vested with title to the accounts as a survivor of Cullmann. Although, technically, Jedd withdrew the funds prior to becoming a survivor of Cullmann, there is nothing in the record to suggest that she did so for fraudulent, coercive or improper reasons. It would be inequitable, therefore, to require her to pay the withdrawn funds to Cullmann's estate. To so require, we believe, would clearly violate the abiding and unequivocal intent of Julianna Cullmann. To so require, we believe, would plainly dishonor the unambiguous desire of the deceased.

We therefore reverse the decision of the probate court directing Jedd to turn over to the estate of Julianna Cullmann the proceeds Jedd obtained approximately one month before Cullmann's death from the bank accounts funded by Cullmann and held jointly by Cullmann and Jedd.

Reversed.